J-A20023-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE INTEREST OF: J.V.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: A.D., NATURAL FATHER | : | |
| | : | No. 278 WDA 2020 |

Appeal from the Decree Entered February 6, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000143-2019

| IN THE INTEREST OF: N.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: A.D., NATURAL FATHER | : | |
| | : | No. 279 WDA 2020 |

Appeal from the Decree Entered February 6, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000144-2019

BEFORE: BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    FILED SEPTEMBER 16, 2020

A.D. ("Father") appeals from the decrees entered on February 6, 2020 granting the petitions filed by the Allegheny County Office of Children, Youth and Families ("OCYF") to terminate his parental rights to his minor children, J.D. a/k/a J.V.D. (a male born in December 2015) and N.D. a/k/a N.M.D. (a male born in May 2017) (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We affirm.

The trial court summarized the facts and procedural history of this case as follows.

OCYF['s] first contact[] with the family [was] in October [] 2014 and January 2015. The basis for these referrals were allegations that [N.G. ("Mother")] was abusing drugs. At that time, Mother had two older children in her care and the subjects of this appeal were not yet born. It was unclear to this court how these referrals were resolved or if the cases became court active. It appears that OCYF had no contact with the family again until J.D. . . . was born [in] December [] 2015. OCYF received reports that [J.D.] tested positive for Suboxone at birth. OCYF spoke with both Mother and Father and they confirmed that the child had in fact tested positive for Suboxone at birth. OCYF began a more thorough investigation of the family and determined that Mother had a history of substance abuse and mental health concerns. During the investigation, Father reported that he was a recovering heroin addict and had a criminal history with multiple incarcerations. He also reported a history of mental health issues. The parents claimed that they were receiving the appropriate level of services for their substance abuse and mental health concerns. OCYF was able to substantiate the parents['] claims that they were in treatment and addressing their drug[,] alcohol and mental health issues. As a result, OCYF closed their case.

N.D. was born [in] May [] 2017. OCYF received a referral on August 9[,] 2017 regarding reports that N.D.'s medical needs were not being met by the parents. The reports also alleged substance abuse concerns for both parents. From August until December [] 2017, OCYF attempted to engage with the family and provide services to the parents. OCYF reported that the parents were unresponsive to their attempts to contact them and were not cooperative with services. OCYF filed a [d]ependency [p]etition on December 2[,] 2017 alleging that the [C]hildren were without proper parental care or control. OCYF sought and was granted an [o]rder for [e]mergency [p]rotective [c]ustody on January 18[,] 2018. [The Children then] were removed from the parent's care. The parties appeared for a [s]helter [h]earing on January 19[,] 2018. [Following the hearing, the C]hildren were returned to Father[. Mother] was permitted to remain in the family home so long as Father supervised all contact between [Mother] and the [C]hildren. The court ordered OCYF to institute in-home services to assist the family. The parties appeared for another hearing on

January 30[,] 2018. The case was continued but the court ordered the parents to cooperate with OCYF [as well as] in-home services and to submit to random urine screens. Father was ordered to complete a screen that day.

An [a]djudicatory [h]earing was held on February 13[,] 2018 and [the C]hildren were adjudicated dependent. Mother appeared visibly intoxicated at the hearing and the court ordered the [C]hildren be removed from Father's care and placed into foster care with paternal grandmother and great-grandmother. Father was ordered to continue working with in-home services, to continue participating with drug and alcohol and mental health treatment, to comply with random urine screens, and to undergo forensic evaluations. The court ordered Father's visits to be supervised until he could provide two consecutive negative drug screens.

Dr. Neil Rosenblum was the court-appointed psychologist assigned to conduct forensic evaluations of the family. On April 26[,] 2018, he conducted an individual evaluation with Father and an interactional evaluation with the [C]hildren and both parents. Dr. Rosenblum diagnosed Father with Cannabis Use Disorder, Opioid Use Disorder, Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, History of Adult Antisocial Behavior, Antisocial Personality Disorder, Unspecified Anxiety Disorder, Posttraumatic Stress Disorder and Parent/Child Relational Problems. He did not believe that Father was putting forth a sincere effort to address his longstanding substance abuse concerns and related mental health difficulties. Dr. Rosenblum concluded that [F]ather "remains in denial regarding his continued difficulties with anger, irritability, and very pervasive lack of self-control in his personal functioning[."] Dr. Rosenblum opined that the parents did well during the interactional evaluation and introduced the [C]hildren to age appropriate activities. He noted that they did a "very adequate job of maintaining" the [Children's] interest and focused on the [Children] throughout the evaluation.

The parties appeared for a [p]ermanency [h]earing on June 5[,] 2018. The court ordered the [C]hildren to remain in the care of their paternal relatives. Father was found to be in minimal compliance with this permanency plan as he had not engaged in drug and alcohol treatment or mental health treatment nor had he attended [a] parenting [program] or cooperated with in-home services on a consistent basis. The court further found that [Father did] not attend random drug screens consistently. Father

was ordered to engage in drug and alcohol treatment, mental health treatment, to cooperate with in-home services and to attend a parenting program. Visits were to remain supervised.

The parties appeared for a [p]ermanency [h]earing on September 4[,] 2018. The court ordered the [C]hildren to remain in foster care placement. Father was found to be in minimal compliance with his permanency plan and to have made minimal progress in alleviating the circumstances which necessitated the original placement of the [C]hildren. The court found that he had not been attending his random drug screens nor had he been meeting with in-home services. Father was ordered to undergo an updated drug and alcohol evaluation and to follow all recommendations. He was also ordered to submit to random urine screens and to continue mental health treatment.

On November 20[,] 2018, the [C]hildren were placed in the foster home of J.E. and L.M. The parties appeared for a [p]ermanency [h]earing on November 29[,] 2018. Father was found to be in moderate compliance with his permanency plan as he [was] engaged in drug and alcohol treatment, [] signed releases and [submitted] to drug screens. He was ordered to attend a parenting program and anger management classes. Visitation was to remain supervised.

The parties appeared for a [p]ermanency [h]earing on February 21[,] 2019. The court ordered the [C]hildren to remain in their foster care placement. Father was found to be in moderate compliance as he was engaged in drug and alcohol treatment, [] signed releases, and was submitting to random drug screens. The court ordered [F]ather to continue drug and alcohol treatment and to continue attending random drug screens. [Father] was also ordered to attend anger management classes and to continue mental health treatment.

Dr. Rosenblum conducted a[ second] individual evaluation of Father on February 27, 2019 and an interactional evaluation with Father and the [C]hildren on February 28[,] 2019. During the individual evaluation, Dr. Rosenblum diagnosed Father with Opioid Use Disorder, Cannabis Use Disorder, Unspecified Bipolar and Related Disorder, Unspecified Trauma and Stressor Related Disorder, Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Antisocial Personality Disorder, Panic Disorder with Agoraphobia and Parent Child Relational Problems. He noted that Father had done a "somewhat better job" at

controlling his irritability and anger. Father [again suggested] that marijuana was the method he chose to treat his mental health issues. Dr. Rosenblum concluded that Father was too reliant on chemical solutions or treatment for his mental health and substance abuse concerns as opposed to being willing to "invest himself in much needed intensive treatment for these problems[."] He concluded that Father appeared "to be content to maintain a dysfunctional lifestyle that essentially leaves him handicapped and unable to establish needed independence or an improved level of functioning[."] Dr. Rosenblum also expressed a concern with the co-dependent relationship between the parents and its effect on their long-standing substance abuse issues. During the interactional evaluation, Dr. Rosenblum noted that the [Children] were both comfortable with Father but that he struggled to keep them interested. Dr. Rosenbloom opined that the [Children] did not respond well to direction from Father and that he was not effective in setting limits for them. He concluded that the [Children] displayed short attention spans and far less disciplined behaviors while with Father as compared to the foster parents.

The parties appeared for a [p]ermanency [h]earing on April 18[,] 2019. The court ordered the [C]hildren remain in foster care placement. Father was found to be in moderate compliance with his permanency plan. The court found that [Father] was engaged in drug and alcohol treatment, [] attended drug screens and [began] anger management therapy.

In early May, the foster parents notified OCYF that they were relocating to Texas. The [C]hildren were removed from their home and placed in the foster home of K.S. (hereinafter "[F]oster [M]other")[.] The parties appeared for a [p]ermanency [h]earing on July 9[,] 2019. The court ordered the [C]hildren to remain in foster care placement. Father was found to be in minimal compliance with the permanency plan as he had not attended any drug screens and [was not] working with in-home services. [In addition, Father was not] attending visits consistently. Father was ordered to engage in dual diagnosis treatment, comply with random urine screens, to attend anger management and [to] work with in-home services and coached visitation.

On August 1[,] 2019, OCYF filed a [p]etition to involuntarily terminate Father's parental rights. The parties appeared for a [p]ermanency [h]earing on October 8[,] 2019 and the court ordered the [C]hildren to remain in their foster home. Foster

Mother [was] granted educational and medical decision-making rights. Father was found to be in minimal compliance as he [was not] attending dual diagnosis treatment [or] submitting to drug screens consistently. The court found that he had only recently re-engaged in mental health treatment and anger management therapy. The court ordered him to work with in-home services, to engage with a parenting program, to attend drug and alcohol and mental health treatment and to submit to random drug screens.

On January 10[,] 2020, Dr. Rosenblum conducted his [third and] final set of evaluations. After the individual evaluation of Father, Dr. Rosenblum diagnosed him with Opioid Use Disorder, History of Cannabis Use Disorder, Posttraumatic Stress Order, Unspecified Bipolar and Related Disorder, Panic Disorder with Agoraphobia, Personality Disorder with Antisocial and Paranoid Features and Parent/Child Relational Problem. [Dr. Rosenblum] noted that Father had difficulty acknowledging any degree of fault or past mistakes on his part. Dr. Rosenblum also reported that Father was quick to project blame for problems onto others and "finds it difficult to engage in any form of self-evaluation in a more open and honest manner[."] During the interactional evaluation, Dr. Rosenblum opined that Father was patient with the [Children] but tended to focus on [J.D.]. Dr. Rosenblum noted that Father struggled to set limits for [N.D.] and was content to allow him to "do his own thing[."] Dr. Rosenblum concluded that Father displayed personality characteristics that would make it difficult to establish confidence that he was on the right track and honest and genuine in his commitment to change.

Trial Court Opinion, 4/20/20, at 2-8 (footnote omitted).

The trial court conducted a termination hearing on January 31, 2020.[1]

The following individuals testified during the hearing: Nina Wiebalk, Supervisor of Family Resources Unification Services; Maria Duranti, OCYF

_____

[1] Attorney Diann McKay represented the Children as their legal interests counsel and Attorney Cynthia Moore served as guardian ad litem ("GAL") to represent the Children's best interests. See In re Adoption of L.B.M., 161 A.3d 172, 179-180 (Pa. 2017).

caseworker; Christie Ross, Wesley Spectrum Family Services' Foster Care Coordinator; Mother and Father. N.T. Hearing, 1/31/20, at 1-164. All three of Dr. Rosenblum's evaluation reports were admitted into evidence during the hearing. Id. at 82-83. At the close of the hearing, the trial court indicated that it would take the matter under advisement. Id. at 163. Ultimately, the trial court terminated both Mother's[2] and Father's parental rights to the Children pursuant to 23 Pa.C.S.A. §§ 2511 (a)(2), (a)(5), (a)(8) and (b). This timely appeal followed.[3]

> Father raises the following issue on appeal:
>
> Whether the [t]rial [c]ourt erred and/or abused its discretion by finding that [OCYF] met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Father] best [met] the needs and welfare of [the Children] pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 6.

Herein, Father argues that OCYF failed to present clear and convincing evidence to support the termination of his parental rights under Section 2511(b). Specifically, Father claims that the trial court erroneously "focused

_____

[2] Mother did not appeal the trial court's decree terminating her parental rights.

[3] Father filed separate notices of appeal on February 25, 2020 as required by Commonwealth v. Walker, 185 A.3d 969 (Pa. 2018) (holding that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each of those cases" pursuant to Pa.R.A.P. 341 and its note). On that same day, Father filed two concise statements of errors complained of on appeal as required by Pa.R.A.P. 1925(b). On March 10, 2020 this Court, acting sua sponte, consolidated the appeals. Order, 3/10/20, at 1. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 20, 2020.

on [his] fault[s]" and "lack of progress" to justify termination and ignored testimony regarding the "undeniable" bond between Father and the Children. Father's Brief at 12-13.

Our standard of review is as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs termination of parental rights. In general, it requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this instance, however, Father does not challenge the trial court's determination under Section 2511(a). See Father's Brief at 6 and 11-14. Instead, Father focuses solely on the court's decision that termination served the Children's best interest under Section 2511(b). Id. Section 2511(b) states:

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Therefore,

Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. In re K.K.R.–S., 958 A.2d 529, 533 (Pa. Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011)[,] citing K.K.R.–S., 958 A.2d at 533–[5]36[.]

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should

also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

Id.[,] quoting In re A.S., 11 A.3d 473, 483 (Pa. Super. 2010)[]; see also In re T.D., 949 A.2d 910, 920–[9]23 (Pa. Super. 2008), appeal denied, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the Parents' rights would prevent T.D. from being adopted and attaining permanency).

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (parallel citations omitted).

Herein, during the termination hearing, multiple witnesses testified that the Children were, in fact, bonded to Father. Specifically, Maria Duranti stated:

They are bonded. They look to their parents. They sit on their parents' laps. They talk to their parents. They appear to be comfortable with their parents.

N.T. Termination Hearing, 1/31/20, at 89. In addition, when asked whether the Children "love [Father]" and whether Father "loves [the C]hildren" Christie Ross answered in the affirmative. Id. at 116. Lastly, in Dr. Rosenblum's evaluation, he stated that "the [Children] had a positive emotional connection to Father." Trial Court Opinion, 4/20/20, at 9-10. Thus, the record supports the existence of a bond between Father and the Children.

The trial court concluded, however, that the bond between Father and the Children is "not necessary and beneficial." Id. at 10. In reaching this conclusion, the trial court explained:

Father has a long history of substance abuse and mental health issues. Father has never made enough progress to secure unsupervised visitation with the [C]hildren. Father has been unable to make any meaningful progress to alleviate the concerns which brought the [C]hildren into care and it is likely that he will never be able to remedy this incapacity. This incapacity has prevented Father from being able to provide the [C]hildren with the permanency that they so desperately need. In contrast, [] [F]oster [M]other has provided the [C]hildren with safety and security. She has worked diligently to address their physical, mental and developmental needs since they were placed in her care. The [C]hildren share a close bond with their [F]oster [M]other. She [displays] a commitment to provide for their developmental, physical and emotional needs [as well as their] welfare.

Through no fault of their own, the [C]hildren have been removed from multiple foster care placements. Permanency for the [C]hildren cannot be held in abeyance in the hopes that Father will make the changes necessary to provide the [C]hildren with the safety and stability that they require. The [C]hildren are in a pre-adoptive placement with an excellent caregiver who can provide the permanency that [they] need presently and into the future.

Id. at 10-11.

Upon review, we discern no abuse of discretion in the trial court's conclusion that the Children's needs and welfare are best served by termination. A review of the record indicates that, prior to OCYF filing the termination petitions on August 1, 2019, Father made "minimal" progress toward alleviating the circumstances which necessitated the original placement. See Trial Court Order, 6/6/18, at 1; Trial Court Order, 9/4/18, at

1; Trial Court Order, 7/9/19; and Trial Court Order, 10/8/19, at 1. Indeed, in Dr. Rosenblum's evaluation, he opined that "Father had not displayed significant progress with his treatment goals or an ability to successfully address the problems which brought the [Children] into care." Trial Court Opinion, 4/20/20 at 9. Both Nina Wiebalk and Maria Duranti also testified during the hearing that Father inconsistently complied with treatment. See N.T. Termination Hearing, 1/31/20, at 39-42 and 72-73. In addition, Maria Duranti testified that Father's lack of progress resulted in his failure to attain unsupervised visits. Id. at 84. Further, Duranti explained that Father failed to attend several visits with the Children. Specifically, she stated that

> [f]rom July 2018 to May 2019, there were 78 scheduled visits, and the parents attended 59 of those visits. And then from May 2019 until [the present,] there were 80 scheduled visits and . . . 27 of those visits were canceled.

Id. at 85. Accordingly, the record demonstrates the Children's bond with Father is not beneficial as he consistently failed to comply with his court-ordered goals to address and resolve the circumstances which gave rise to placement in the first place.

Testimony during the termination hearing also demonstrated that the Children are bonded with Foster Mother. Specifically, Duranti testified that the Children call Foster Mother "mom." N.T. Termination Hearing, 1/31/20, at 108. In addition, Dr. Rosenblum provided the following analysis of the Children's relationship with Foster Mother.

[F]oster [M]other [is] very patient and calm in her interactions with the [Children].  [The C]hildren [have] a "very comfortable attachment" with [F]oster [M]other and [are] eager to receive attention from her.  [In addition,] there [is] "clearly a very comfortable rapport and positive emotional connection which the [Children] evidence with [F]oster [M]other at this time, with both [Children] appearing to be very settled and secure in their present home environment[."  F]oster [M]other ha[s] a remarkably mature and well-developed understanding of the [Children's] emotional needs.  [T]he [C]hildren [are] "currently enjoying a very safe, secure, and stable family environment which [is] meeting their needs exceptionally well[."]

Trial Court Opinion, 4/20/20, at 10.  Thus, the record demonstrates that the Children's bond with Father is not necessary as they are bonded with Foster Mother who consistently provides for their needs.

Based upon the foregoing, we discern no abuse of discern and affirm the trial court's termination decree.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2020